UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| DOUGLAS DOWLING, | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| v. | ) | Case No. 4:21-cv-01414-SRC |
| | ) | |
| THE BOEING COMPANY, | ) | |
| | ) | |
| Defendant(s). | ) | |

**<u>Memorandum and Order</u>**

Douglas Dowling, who has a prosthetic leg, quit his job as an assembly mechanic at the Boeing Company after Boeing allegedly, among other things, discriminated against him on the basis of his disability time and time again. He brought claims against Boeing under the Missouri Human Rights Act for disability discrimination, failure to accommodate, hostile work environment, and retaliation. Doc. 33. Boeing now moves for summary judgment on all claims. Doc. 39.

**I.      Background**

Unless otherwise noted, the parties agree on the following material facts. Dowling began working for Boeing as an assembly mechanic in 2015. Doc. 44 at ¶ 1. Dowling worked on the F-15 team, *id.* at ¶ 11, on which, according to Dowling, mechanics performed "subassembly" of aircraft, *id.* at ¶ 15. In 2016, due to injuries sustained in a motorcycle accident, Dowling underwent surgery involving the amputation of his left leg above the knee. *Id.* at ¶¶ 2–3. After FMLA leave during which Dowling learned to use a prosthetic leg, he returned to work, still on the F-15 team. *Id.* at ¶¶ 4–5, 11.

A few years later, in August of 2019, Boeing transferred Dowling to the "F-18/Service Life Modification" program. *Id.* at ¶ 11. Mechanics on that team, according to Dowling, "rebuil[t]" entire aircraft. *Id.* at ¶ 15. Dowling soon requested a transfer back to the F-15 team, *id.* at ¶ 13, because, according to Dowling, he faced physical difficulties in performing jobs on the F-18 team, *id.* at ¶ 15. After Dowling made the request, his supervisor, Ronnie Imm, purportedly assigned work that was "not on the F-18 aircraft"—an assignment that Dowling deemed a punishment for requesting a transfer. *Id.* at ¶ 14–15.

In January of 2020, Dowling complained that this non-aircraft work—specifically, climbing up and down ladders and carrying whiteboards—had aggravated his left leg. *Id.* at ¶ 19. Boeing's medical department then provided Dowling with temporary restrictions for one month to give Dowling time to get paperwork from his physician to support a request for permanent restrictions or accommodations. *Id.* at ¶ 22. A couple months after the temporary restrictions expired, Dowling returned to Boeing Medical. Dowling had not provided the appropriate paperwork from his physician, so a nurse issued three more months of temporary restrictions, again to give Dowling time to obtain the necessary paperwork. *Id.* at ¶¶ 25, 27.

On May 8, 2020, Dowling's F-18 supervisor, Imm, attempted to terminate Dowling after a dispute arising from Dowling's not wearing a COVID-19 facemask. *Id.* at ¶¶ 38–45. Imm and another Boeing employee walked Dowling out of the building and collected his badge, but Dowling's union eventually persuaded Boeing to allow him to return to work with lesser discipline than that of termination. *Id.* at ¶¶ 48–50. Boeing, upon Dowling's return in June, transferred him back to the F-15 team, where he reported directly to Ken Abram and where he would remain until the end of his employment with Boeing. *Id.* at ¶¶ 56–57.

Also in June, Dowling filed an internal ethics complaint alleging mistreatment by Imm and others. *Id.* at ¶ 58. Dowling's new manager, Abram, became aware of this complaint. Doc. 49 at ¶ 1. A couple months later, in August of 2020, Dowling also filed a charge of discrimination with the Missouri Commission on Human Rights, of which Abram also apparently became aware. Doc. 44 at ¶ 60–61; Doc. 40 at p. 30.

In the meantime, Dowling had been working with Boeing's medical department to get permanent accommodations. Dowling admits that—absent accommodations—he could not perform, or had difficulty performing, a number of tasks required of an assembly mechanic at Boeing. Doc. 44 at ¶¶ 109–110. After receiving the relevant paperwork from Dowling's physician on May 14, 2021, Boeing issued Dowling an electric scooter for transportation around the building as a permanent accommodation. Doc. 44 at ¶ 72. Boeing also arranged for Dowling to undergo a "functional capacity evaluation" with a third-party provider. *Id.* at ¶ 75. The administering physical therapist wrote in his report that Dowling met only 45.45% (5/11) of the job demands required of an Assembly Mechanic. *Id.* at ¶ 77. After receiving the report, Boeing granted all of the permanent restrictions that Dowling's doctor had recommended. *Id.* at ¶ 78.

Sometime in 2021, Dowling's F-15 supervisor, Abram, filed a report with Boeing Ethics about Dowling's refusal to perform assigned work. *Id.* at ¶ 94. A Boeing investigator reached out to Dowling to discuss Abram's report in November. *Id.* at ¶ 95. Eventually, on November 28, 2021, Dowling sent the investigator an email stating, "[a]s of this date, I am resigning from my employment with Boeing." *Id.* at ¶ 97. The next day, he placed a copy of that email on Abram's desk and left Boeing for good. *Id.* at ¶¶ 98, 100–102.

The following January, Dowling amended his second charge of discrimination to allege that Boeing constructively discharged him. *Id.* at ¶ 103. Dowling brought a state-court action,

3

which Boeing removed to this Court.  Docs. 7, 1.  Dowling has since amended his complaint, Doc. 33, and Boeing now seeks judgment on all claims, Doc. 39.

**II.     Standard**

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Rule 56(a) also provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from the underlying facts.  *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987).  The moving party bears the initial burden of showing both the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(a).

In response to the proponent's showing, the opponent must come forward with specific facts showing that there is a genuine issue for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(c).  Self-serving, conclusory statements without support will not suffice to defeat summary judgment.  *Armour & Co., Inc. v. Inver Grove Heights*, 2 F.3d 276, 279 (8th Cir. 1993).  The opponent must show a genuine issue of fact, meaning a reasonable jury could return a verdict in its favor.  *Liberty Lobby*, 477 U.S. at 248.

**III.   Discussion**

    **A.   Disability Discrimination**

Dowling alleges that Boeing discriminated against him on the basis of his disability in violation of the Missouri Human Rights Act by, among other things, constructively discharging him. Doc. 33 at ¶¶ 79–88. Boeing seeks judgment on this claim, arguing the absence of any material fact and entitlement to judgment under the MHRA. Doc. 39 at ¶¶ 5–8. The MHRA provides:

> 1. It shall be an unlawful employment practice:
>
> (1) For an employer, because of the . . . disability of any individual:
>
> (a) To fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . disability[.]

Mo. Rev. Stat. § 213.055.1(a). The statute defines "disability," in relevant part, as "a physical . . . impairment which substantially limits one or more of a person's major life activities, . . . which with or without reasonable accommodation does not interfere with performing the job . . . ." *Id.* § 213.010(5). "[P]erforming the job," more specifically, means the employee must be able to perform the "essential functions" of the job with or without a reasonable accommodation. Mo. Code Regs. Ann. tit. 8, § 60-3.060(1)(F). "In other words, if despite the substantial limitation the physical impairment otherwise causes, the employee can perform the essential functions of his job with or without a reasonable accommodation, then he has a 'disability' for purposes of the MHRA" and can claim the statute's protection. *Loerch v. City of Union Mo.*, 643 S.W.3d 597, 602 (Mo. Ct. App. 2022).

Dowling must prove that he has a "disability" within the meaning of the MHRA "[a]s a threshold element of his [disability-discrimination] MHRA claim." *Id.* at 602 (citing *Medley v.*

5

*Valentine Radford Commc'ns, Inc.*, 173 S.W.3d 315, 321 (Mo. Ct. App. 2005). "The first aspect of the threshold inquiry is whether Plaintiff's [physical impairment] substantially limits a major life activity. One such 'major life activity' is the activity of working." *Id.* at 602–03 (first citing Mo. Code Regs. Ann. tit. 8, § 60-3.060(1)(C); and then citing *State ex rel. Sir v. Gateway Taxi Mgmt. Co.*, 400 S.W.3d 478, 490 (Mo. Ct. App. 2013)). The parties agree on facts showing that Dowling's impairment "substantially limit[ed]" his ability to work. *E.g.*, Doc. 44 at ¶¶ 109–110.

The parties diverge, however, when it comes to the next aspect of the threshold inquiry: "whether, [1] with or without *reasonable* accommodation, [2] Plaintiff was able to perform the *essential* functions of his job." *Loerch*, 643 S.W.3d at 603 (first citing Mo. Rev. Stat. § 213.010(5); and then citing Mo. Code Regs. Ann. tit. 8, § 60-3.060(1)(F)) (emphasis added). "'[E]ssential functions' refer to those 'fundamental job duties' of the position." *Id.* at 604 (citing 29 C.F.R. § 1630.2(n)(1)). Dowling admits that, *without* accommodation, he could not perform certain essential job duties. For example, Dowling admits that the physical therapist who administered the "functional capacity evaluation," wrote in his report that "Dowling met only 45.45% (5/11) of the job demands required of an Assembly Mechanic" without accommodation. Doc. 44 at ¶ 77. He also admits that he could not perform, or had difficulty performing, certain functions "required of an Assembly Mechanic at Boeing" without accommodation. *Id.* at ¶¶ 109–110. Such functions include using ladders, kneeling, squatting, moving boxes, twisting, pushing, pulling, standing, and sitting for extended periods of time. *Id.* at ¶ 109.

Acknowledging his inability to perform, or difficulty in performing, those "required" functions *without* accommodation, Dowling attempts to create a dispute of fact as to whether he could perform the essential functions "with . . . *reasonable* accommodation." Doc. 46 at pp. 14–15; Doc. 44 at ¶¶ 77, 110. In responding to Boeing's facts, he points to the possibility of a

restructured position. Pointing to his deposition testimony, he states that he "could have performed a number of jobs as an assembly mechanic, with his physical limitations, in different parts of the assembly process on the F-15 line such as precision machinery, sub shop work, inspection work, tube mock-up, and tooling." Doc. 44 at ¶ 77 (citing Doc. 44-2 at pp. 19:20–20:25, 21:15–22, 22:1–24).

The Court focuses its inquiry on whether a dispute of fact exists as to the reasonableness of such an accommodation. Accommodations under the MHRA may include "[j]ob restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, the provision of readers or interpreters and other similar actions." *Loerch*, 643 S.W.3d at 606 (quoting Mo. Code Regs. Ann. tit. 8, § 60-3.060(1)(G)(2)(B)). Accommodations, to qualify as reasonable, must not "impose[] undue financial and administrative burdens" or "require[] fundamental alterations." *Id.* (quoting *Lomax v. DaimlerChrysler Corp.*, 243 S.W.3d 474, 480 (Mo. Ct. App. 2007)). In *Loerch*, the trial court granted summary judgment in favor of the defendant-employer. The Missouri Court of Appeals reversed, concluding in part that the defendant had failed to demonstrate that the plaintiff's requested accommodation—having another employee perform the work he could not do—was unreasonable as a matter of law or otherwise. *Id.* at 606, 608. The Court echoes here the upshot of *Loerch*: "Whether a particular accommodation qualifies as reasonable 'requires an individual assessment' and 'is dependent upon the facts of each case.'" *Id.* (quoting *Lomax*, 243 S.W.3d at 480–81).

Boeing points out that the restructuring that Dowling contemplates would have required eliminating certain essential job duties as to Dowling and assigning them to other employees. Doc. 48 at ¶ 77; Doc. 47 at p. 3. Like the defendant-employer in *Loerch*, Boeing "relie[s] on the proposition that, as a matter of law, assigning other workers to perform tasks for Plaintiff is

7

unreasonable." *Loerch*, 643 S.W. 3d at 606.  Boeing cites a number of Eighth-Circuit cases in support of that proposition.  Doc. 47 at p. 3 (first citing *Piziali v. Grand View Coll.*, 208 F.3d 218 (8th Cir. 2000); then citing *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 950 (8th Cir. 1999); and then citing *Lloyd v. Hardin Cnty., Iowa*, 207 F.3d 1080, 1084 (8th Cir. 2000)); Doc. 48 at ¶ 77 (citing *Hatchett v. Philander Smith Coll.*, 251 F.3d 670, 678 (8th Cir. 2001)).

      All of Boeing's cases, however, involve the Americans with Disabilities Act—not the MHRA.  While Missouri courts in MHRA cases look to ADA caselaw for guidance when consistent with Missouri law, *Loerch*, 643 S.W.3d at 608 (citing *Daugherty v. City of Maryland Heights*, 231 S.W.3d 814, 818 (Mo. 2007)), Missouri courts have taken "a case-by-case approach to determining the reasonableness of accommodations," *id.* at 607.  And the Missouri Court of Appeals has explicitly noted that it cannot reconcile its case-by-case approach to reasonableness with the proposition under the ADA that assigning tasks that a plaintiff cannot perform to other employees is unreasonable as a matter of law.  *Id.* at 608.  So even assuming (without concluding) that Boeing's cases bear factual similarities to the present question, the Court cannot rely on them here.  *Id.*

      Applying the fact-intensive, case-by-case approach that Missouri caselaw requires, the Court concludes that a genuine issue of material fact exists as to the reasonableness of the accommodations that Dowling would have needed to perform the essential functions of his job.  Boeing has not offered any undisputed facts establishing that such accommodations would have imposed undue financial or administrative hardship or require fundamental alterations.  *Id.* at 606 (quoting *Lomax*, 243 S.W.3d at 480–81).  Dowling, for his part, regards such accommodations as reasonable.  Doc. 44 at ¶ 77; Doc. 46 at p. 14–15.  Accordingly, a genuine issue of material fact exists as to whether Dowling could perform the essential functions of an assembly mechanic

with *reasonable* accommodations. *Matsushita*, 475 U.S. at 587. Because the Court cannot conclude, as a threshold matter, that Dowling does or does not have a "disability" for purposes of the MHRA, it cannot proceed in the discrimination analysis. *Loerch*, 643 S.W.3d at 602 (citing *Medley*, 173 S.W.3d at 321). The Court denies Boeing's motion as to Dowling's disability-discrimination claim.

### B.     Failure to Accommodate and Hostile Work Environment

Dowling also brings a failure-to-accommodate claim and a hostile-work-environment claim. The Court again faces the threshold issue of whether Dowling has a "disability" under the MHRA such that he can raise these claims. But first, the Court takes up the parties' disagreement over whether Dowling adequately pleaded these claims in his amended complaint. Dowling organized his allegations under two "counts," one titled "discrimination on the basis of disability in violation of the Missouri Human Rights Act" and one titled "retaliation for reporting discrimination in violation of the Missouri Human Rights Act." Doc. 33 at pp. 13, 15. Noting that Dowling did not separately enumerate a failure-to-accommodate claim and a hostile-work-environment claim, Boeing argues that he "failed[] to specifically plead [these claims]" in his amended complaint. Doc. 39 at ¶ 9. Under the liberal pleading standard of Rule 8 of the Federal Rules of Civil Procedure, however, the Court concludes that Dowling adequately pleaded the claims in question—even if his approach in doing so flirts with risk.

"A pleading that states a claim for relief must contain: . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Each allegation must be simple, concise, and direct. No technical form is required." Fed. R. Civ. P. 8(d)(1). As the Eighth Circuit has held, "[t]he essential function of a complaint under the Federal Rules of Civil Procedure is to give the opposing party 'fair notice of the nature and basis or grounds for a

9

claim, and a general indication of the type of litigation involved.'" *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014) (quoting *Hopkins v. Saunders*, 199 F.3d 968, 973 (8th Cir. 1999)). "The well-pleaded facts alleged in the complaint, not the legal theories of recovery or legal conclusions identified therein, must be viewed to determine whether the pleading party provided the necessary notice and thereby stated a claim in the manner contemplated by the federal rules." *Id.* (quoting *Parkhill v. Minn. Mut. Life Ins. Co.*, 286 F.3d 1051, 1057–58 (8th Cir. 2002)). The question, then, is not whether Dowling cited or identified the correct statutes or attached the correct labels to his counts, but whether his factual allegations gave Boeing "fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved." *Id.* (quoting *Hopkins*, 199 F.3d at 973).

A number of Dowling's allegations put Boeing on notice of the grounds for his failure-to-accommodate claim. While the parties have not cited, and the Court has not found, any Missouri cases laying out the elements of a failure-to-accommodate claim under the MHRA, the parties agree that the MHRA allows for such a claim, Doc. 40 at pp. 22–25; Doc. 46 at pp. 19–26, and Dowling has cited an Eight-Circuit case recognizing it, *id.* at p. 20 (citing *Mobley v. St. Luke's Health Sys., Inc.*, 53 F.4th 452, 456 (8th Cir. 2022)). In addressing separate failure-to-accommodate claims under the ADA and the MHRA simultaneously, the Eighth Circuit recently laid out the following test: "[t]o make a prima facie case for a failure to accommodate under the ADA, an employee must show that he (1) has a disability within the meaning of the ADA, (2) is a qualified individual under the ADA, and (3) suffered an adverse employment action due to his disability." *Mobley*, 53 F.4th at 456 (citing *Huber v. Wal-Mart Stores, Inc.*, 486 F.3d 480, 482 (8th Cir. 2007)); *id.* at 456 n.4 ("Because the ADA and MHRA use the same modified burden-shifting framework, we evaluate Mobley's state and federal failure-to-accommodate claims

10

simultaneously." (citing *Mole v. Buckhorn Rubber Prod., Inc.*, 165 F.3d 1212, 1216 (8th Cir. 1999))). "The same analysis applies to claims under the MHRA." *Mole*, 165 F.3d at 1216 (applying ADA standard to MHRA failure-to-accommodate claim).

The Court, following the Eight Circuit's lead, applies the ADA test. *Mobley*, 53 F.4th at 456; *Loerch*, 643 S.W.3d at 608 (citing *Daugherty*, 231 S.W.3d 814, 818 (Mo. 2007). Dowling pleaded that he has a disability under the MHRA, that Boeing "failed to reasonably accommodate" his known physical limitations, and that he suffered adverse employment actions. Doc. 33 at ¶¶ 80, 84, 85. Such allegations gave Boeing "fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved." *Topchian*, 760 F.3d at 848 (quoting *Hopkins*, 199 F.3d at 973). Dowling adequately pleaded a failure-to-accommodate claim.

A number of Dowling's allegations put Boeing on notice of the grounds for his hostile-work-environment claim as well. To prevail on such a claim, a plaintiff must prove that: "(1) he is a member of a group protected under the MHRA; (2) he was subjected to unwelcome harassment; (3) the plaintiff's membership in the protected group was a motivating factor in the harassment; and (4) a term, condition, or privilege of the plaintiff's employment was affected by the harassment." *Eivins v. Missouri Dep't of Corr.*, 636 S.W.3d 155, 179 (Mo. Ct. App. 2021) (citing *McGaughy v. Laclede Gas Co.*, 604 S.W.3d 730, 748 (Mo. Ct. App. 2020)). Dowling pleads that he has a disability under the MHRA, that he was "subjected to pervasive harassment," including demands to perform job duties "outside his physical restrictions," and that he suffered a constructive discharge. Doc. 33 at ¶¶ 53, 74, 80, 85, 86. These allegations, too, gave Boeing "fair notice of the nature and basis or grounds for a claim, and a general

11

indication of the type of litigation involved." *Topchian*, 760 F.3d at 848 (quoting *Hopkins*, 199 F.3d at 973).

Having concluded that Dowling adequately pleaded his failure-to-accommodate and hostile-work-environment claims, the Court turns to the question whether Boeing has shown an absence of dispute as to any material fact and entitlement to judgment on these claims. As noted, each claim presents a threshold question of whether Dowling has a disability within the meaning of the MHRA. *See Mobley*, 53 F.4th at 456; *Eivins*, 636 S.W.3d at 179. Having already found a genuine issue of material fact on this question, the Court denies Boeing's motion for summary judgment as to these claims.

## C. Retaliation

Dowling alleges that Boeing retaliated against him in violation of the MHRA for engaging in protected activity. Doc. 33 at ¶¶ 51–78, 89–95. Boeing moves for summary judgment. Doc. 39 at ¶¶ 12–13. The MHRA provides:

> It shall be an unlawful discriminatory practice for an employer, employment agency, labor organization, or place of public accommodation: . . . [t]o retaliate or discriminate in any manner against any other person because such person has opposed any practice prohibited by this chapter or because such person has filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding or hearing conducted pursuant to this chapter.

Mo. Rev. Stat. § 213.070.1(2). The MHRA prohibits retaliation "in any manner," and the Missouri Supreme Court has defined "to retaliate" as "to 'inflict in return.'" *Keeney v. Hereford Concrete Prod., Inc.*, 911 S.W.2d 622, 625 (Mo. 1995) (quoting *Webster's Third New Int'l Dictionary* 1938 (1976)). Since 2017, the MHRA has used the motivating-factor causation standard; under the statute, "because" means, "as it relates to the adverse decision or action, the protected criterion was the motivating factor." Mo. Rev. Stat. § 213.010(2). "Motivating factor"

12

means "the employee's protected classification actually played a role in the adverse action or decision and had a determinative influence on the adverse decision or action." *Id.* § 213.010(19).

To present a prima facie case of retaliation, a plaintiff must show:  (1) he engaged in protected activity under the MHRA; (2) the employer took adverse action against him; and (3) a causal relationship existed between the protected activity and the adverse action. *Eivins*, 636 S.W.3d at 180.  Regarding the "adverse action" element, the "Missouri Supreme Court has explained that, although federal law requires a retaliation claimant to demonstrate that an 'adverse *employment* action' has occurred . . . , the MHRA does not." *Mignone v. Mo. Dep't of Corr.*, 546 S.W.3d 23, 36 (Mo. Ct. App. 2018) (emphasis added).  "As used in the statute, retaliation includes any act done for the purpose of reprisal that results in damage to the plaintiff . . . ." *Keeney*, 911 S.W.2d at 625.  And damages in a retaliation case may include lost income as well as "awards for emotional distress and humiliation." *Soto v. Costco Wholesale Corp.*, 502 S.W.3d 38, 48 (Mo. Ct. App. 2016) (citing *Gateway Taxi Mgmt. Co.*, 400 S.W.3d at 491).

Regarding the causation element, a plaintiff must "demonstrat[e] that his complaint of discrimination was a 'motivating factor' in the [employer's] adverse . . . action by providing direct evidence of retaliation, or creating an inference of retaliation under the *McDonnel Douglas* [sic] burden-shifting framework." *Eivins*, 636 S.W.3d at 180 (first citing *Soto*, 502 S.W.3d at 48; then citing Mo. Rev. Stat. § 213.101.4; and then citing *Donathan v. Oakley Grain, Inc.*, 861 F.3d 735, 740 (8th Cir. 2017)).  "Direct evidence . . . includes evidence of 'remarks of the employer that reflect a discriminatory attitude,' as well as 'comments which demonstrate a discriminatory animus in the decisional process or those uttered by individuals closely involved

13

in employment decisions.'"  *Roberts v. Park Nicollet Health Servs.*, 528 F.3d 1123, 1128 (8th Cir. 2008) (quoting *EEOC v. Liberal R–II Sch. Dist.*, 314 F.3d 920, 923 (8th Cir. 2002)).

Boeing argues that Dowling cannot establish that it took any retaliatory action against him because he engaged in protected activity, and that all action it took against Dowling was justified.  Doc. 40 at pp. 28–29; Doc. 47 at pp. 12–14.  For example, Boeing offers the facts that sometimes Dowling would "not even attempt[] to perform any of the tasks he was assigned" and that "[o]n or about September 22, 2021, Abram sent Dowling home for three days without pay, after Dowling once again refused to [perform an assigned task]."  Doc. 41 at ¶¶ 91, 93.  Dowling admits that Abram suspended him, but he has come forward with evidence showing that Dowling's engagement in protected activity may have motivated the suspension (and any other adverse actions).  Dowling points to an assertion that Abram made after Dowling had filed an internal ethics complaint against his former manager Ronnie Imm in June of 2020.  Doc. 44 at ¶ 93.  Dowling testified about these remarks at deposition:

> Q:  You said that Ken [Abram] made comments that you thought were retaliation.  What were those comments?
>
> A:  Uh, the comments about, uh, firing me and stuff over, um, needing accommodations.  Uh, he made a couple comments, I can't remember off the top of my head, while I was going through the process of actually filing for the, uh, retaliation.  Um, things about how I shouldn't have done that, or it's going to hurt me, it's going to mess my career up and stuff like that.  *But saying it in a way that was kinda like he was almost going to be the one that stepped in and did something about it* when I was going through all that.
>
> Q:  Yeah.  When you were going through what specifically?
>
> A:  The retaliation, uh, process.  When I was going through all of that when I filed.
>
> Q:  Filed.  And what is it that you filed?
>
> A:  I filed with Boeing originally through their, um, it's not an HR department.  It's, um, ethics.  I filed through ethics.

14

> . . .
>
> Q: And you interpreted him to mean he, Ken [Abram], was going to do something to your career?
>
> A: Yes, ma'am.

Doc. 44-2 at pp. 31:4–25, 32:11–13 (emphasis added). While the suspension occurred over one year after Dowling filed the ethics complaint, Doc. 44 at ¶¶ 58, 93, Dowling's facts support the inference that the suspension was one action in a chain of acts of reprisal spanning over a year: he asserts that Abram "created a hostile work environment with the goal of getting [him] to quit his employment with Boeing" from the time he rejoined the F-15 team—i.e., around the time he filed the ethics complaint. Doc. 44 at ¶ 93 (citing Doc. 44-3 at pp. 28:5–14, 30:23–31:20).

Dowling appears to frame his evidence as circumstantial under the *McDonnell Douglas* paradigm, Doc. 46 at pp. 28–29, but Abram's alleged assertion, "taken in the light most favorable to [Dowling], may fairly be considered direct evidence" that Dowling's protected activity motivated Abram's actions, like suspending him without pay in September of 2021, *Roberts*, 528 F.3d at 1128. In *Roberts v. Park Nicollet Health Services*, the district court granted summary judgment in favor of the defendant-employer on plaintiff's sex-discrimination claim. *Id.* at 1124. On appeal, the plaintiff pointed to her own account of her supervisor's response to her announcement that she was pregnant: the supervisor "sighed" and asked, "What are you going to do about the pregnancy; are you going to keep it?" *Id.* at 1128.

The Eighth Circuit considered the plaintiff's account of this conversation to be direct evidence—even though she had presented it as circumstantial evidence under the *McDonnell Douglas* paradigm. The court concluded that "[a] reasonable jury could infer that [the supervisor's] sigh, together with the question, amount to an expression of frustration by [the supervisor] that [the plaintiff] had become pregnant, and an indication that a decision by [the

15

plaintiff] to continue the pregnancy would be disfavored." *Id.* Accordingly, the panel reversed the district court's ruling, having found a genuine issue of material fact as to discrimination. *Id.* at 1129. Just so here, a reasonable jury could infer that Abram's expression of regret that Dowling had filed a complaint and warnings that it could "mess up [Dowling's] career"—together with Dowling's testimony that the manner of Abram's delivery of these remarks suggested that he planned to "step[] in and d[o] something" to Dowling's career—amounted to an expression of Abram's plan to retaliate against Dowling for his engagement in protected activity. Abram's assertion "also provide[s] an independent basis on which a reasonable jury could find that [Boeing's] explanation for the employment action was pretextual, and that [Dowling's protected activity] was a motivating factor in the employment decision." *Id.* at 1128 (citing *Williams v. Valentec Kisco, Inc.*, 964 F.2d 723, 728 (8th Cir. 1992)).

      The Court does not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter on summary judgement, *see Liberty Lobby Inc.*, 477 U.S. at 249, so the Court does not decide whether Dowling's testimony floats his claim, or whether Boeing's evidence will sink his claim. Dowling may indeed struggle to convince a jury. But drawing all inferences in his favor—the Court's mandate on summary judgment—the Court concludes that a reasonable jury *could* find that Dowling's protected activity motivated Boeing to retaliate against him. *AgriStor Leasing*, 826 F.2d at 734. And that is enough to create a genuine issue for trial. *Liberty Lobby Inc.*, 477 U.S. at 249; *see Roberts*, 528 F.3d at 1129 ("This is not to say that we think a jury necessarily would find that [defendant-employer] was motivated by [plaintiff's] pregnancy. . . . There are substantial credibility disputes . . . . But these factual disputes cannot be resolved on a motion for summary judgment, and we conclude that the

16

evidence discussed above is substantial enough to create a genuine dispute for trial."). The Court denies Boeing's motion as to Dowling's retaliation claim.

## IV. Conclusion

Having found a genuine issue of material fact as to each of Dowling's claims, the Court denies Boeing's motion for summary judgment. Doc. 39.

So Ordered this 27th day of March, 2023.

*/s/ SLR.CR*

STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE